ROBERT ELY *et al.*, Relators-Appellees, v. MICHAEL SHEAHAN, Sheriff of Cook County, Illinois, Respondent-Appellant.

First District (2nd Division)   Nos. 1—03—3575, 1—03—3576 cons.

Opinion filed September 30, 2005.—Rehearing denied September 30, 2005.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Manny Magence, Assistant State's Attorneys, of counsel), for appellant.

Serpico, Novelle, Petrosino & Rascia, of Chicago (Robert A. Novelle, Sr., and Timothy R. Roellig, of counsel), for appellees.

PRESIDING JUSTICE GARCIA delivered the opinion of the court:
In response to an extradition request from the Governor of

Michigan, Governor's warrants were issued and relators, Robert Ely and Michael Miller, were arrested in Cook County, Illinois, as fugitives from justice. The Governor's warrant for Ely indicated that he was wanted for burglary-related crimes committed in Eastpointe, Michigan.[1] The Governor's warrant for Miller indicated that he was wanted for a home invasion, conspiracy to commit home invasion, and unarmed robbery, committed in Eastpointe, Michigan. Pursuant to section 10 of the Uniform Criminal Extradition Act (Extradition Act) (725 ILCS 225/10 (West 2002)), both relators petitioned the circuit court of Cook County for a writ of *habeas corpus* claiming they were not in the State of Michigan at the time the offenses were allegedly committed. After a hearing, the circuit court granted the writs and quashed and recalled the Governor's warrants. The respondent, Michael Sheahan, sheriff of Cook County, appeals.

## I. BACKGROUND

The State of Michigan sought the extradition of Ely and Miller in connection with a string of home invasions that occurred in December 2001 in Eastpointe, Michigan. Ely was charged with three counts of home invasion committed on December 11, 12, and 14, 2001. Miller was charged with one count of home invasion committed on December 11, 2001, and one count of home invasion, one count of conspiracy to commit home invasion, and one count of unarmed robbery committed on December 13, 2001. In response to the extradition request, two Governor's warrants were issued. The Governor's warrants, along with supporting documentation, were introduced into evidence at the relators' hearing on their petitions for writs of *habeas corpus*. Each relator presented evidence supporting his claim that he was in Illinois at the time the offenses were committed. Lieutenant John Calabrese of the Eastpointe, Michigan, police department, testified concerning the identification of each relator by the robbery victims.

### A. Evidence Regarding Relator Ely

Ely presented five witnesses to support his argument that he was not in the State of Michigan at the time the offenses were committed. Baja Pileczka, the owner of a nail salon, testified that on December 11, 2001, Ely kept a 1:15 p.m. appointment for a manicure, but he did not keep a 5:30 p.m. appointment for a massage. The respondent sought to impeach Pileczka with testimony from Lieutenant Cala-

---

[1]The Governor's warrant for Ely is not part of the record of this appeal. We, therefore, rely on Ely's petition for writ of *habeas corpus*, his memorandum of law in support of the petition, and the transcripts from the hearing on the petition.

brese, who testified that Pileczka told him that she had no clear recollection of the events of December 11, 2001.

Dewey Paccagnini, an insurance investment broker, testified that in the late afternoon on December 11, 2001, he was with Ely at Ely's home, reviewing Ely's mother-in-law's insurance policy.

Anna Lopez, who works in the business licensing section of the City of Chicago's department of revenue (department), testified that Ely came to her office on December 12, 2001, and tried to apply for a business license. Lopez scheduled another appointment with Ely on December 14, 2001. Ely returned on December 14 but did not complete the application. During cross-examination, Lopez testified that she could not be certain that Ely visited the department on December 12 and 14, 2001.

The respondent sought to impeach Lopez with testimony from Mary Lou Eisenhauer, the deputy director of business services for the department, who testified that a license applicant generally would not see a public information officer unless he completed the necessary paperwork. The respondent also sought to impeach Lopez's testimony with that of Alexander Vroustonuris, the City of Chicago's inspector general, who testified that Lopez told him that she could not identify Ely. Rosa Narvaez, Ely's investigator, also testified as to the licensing procedure at the department.

Ely called Lieutenant Calabrese, who testified that he investigated a string of home invasions in Eastpointe, Michigan, and received information that members of a certain Chicago group were responsible for the crimes. He focused his investigation on this certain group despite the fact that the initial identifications of the perpetrators indicated that they were either "white male" or "male Italian." Calabrese had a book from the Illinois State Police with photographs of "known home improvement-type crime offenders from Chicago." The book consisted of 23 pages with 10 to 12 photographs per page.

Calabrese showed this book to Vita Milano, an elderly woman who was victimized on both December 12 and 14, 2001, by the same person. Milano identified Ely's photograph as the individual she personally observed commit the offense on December 12, 2001. Stephen Smiertka, a man of approximately 90 years of age, identified the photograph of Ely as one of the men who robbed him on December 11, 2001. Calabrese testified that the victims viewed the entire book of photographs and were very sure of the people that they identified.

Calabrese was recalled by Ely and testified to a conversation he had with "Sonny" Michael Miller, an individual who pleaded guilty to three misdemeanors in the same string of burglaries. Sonny pleaded guilty to the three charges without any agreement that he would as-

sist authorities with the remaining cases, but after he was sentenced, Sonny begged for a deal and said that he would identify those who were involved in the crimes. Sonny did not tell Calabrese who was involved but stated that Ely and Miller were not involved. Calabrese stated that he found the statement unworthy of belief because "very few people in this world *** are less credible than [Sonny,]" and the statement did not match the evidence.

## B. Evidence Regarding Relator Miller

Miller called four witnesses and testified on his own behalf to support his claim that he was not in the State of Michigan at the time the offenses occurred. Dr. Amy Klichowski testified that although she had no personal recollection, a hospital record existed from December 9, 2001, establishing that she treated Miller for a kidney stone at the Ravenswood Hospital emergency department. Dr. James Daleo, who neither saw nor treated Miller, reviewed his hospital records and testified that the pain associated with passing a kidney stone was "one of the worst pains" a person could experience and that the intensity of the pain could wax and wane.

Nustra Omervic testified that on the afternoon of December 13, 2001, she delivered flowers to Miller's home, where Miller was in bed and looked pale. Although Omervic testified she was certain December 13 was a Friday, the circuit court took judicial notice that December 13, 2001, was actually a Thursday.

Danny Johnson, Miller's brother, testified that Miller did not leave his house from December 9 through December 16, 2001, because of the pain from his kidney stone. Johnson testified that Miller would not have been in Michigan with Ely because the men hated one another, their families had been feuding for more than 20 years, and Ely had an affair with Miller's wife.

Miller testified on his own behalf that he was not in Michigan at the time the offenses were committed but stayed in his house from December 9 through December 16, 2001. He testified that he would not leave Illinois because after successfully contesting a prior extradition request, it was his only safe haven.

As he testified regarding relator Ely, Lieutenant Calabrese testified that he showed the victims a book containing photographs of persons known to be involved in home-improvement-type crimes. Marie Smiertka identified the photograph of Miller as one of the men who robbed her in her home on December 11, 2001. In addition, Cosma Agrusa identified the photographs of Miller and Sonny as the people who forced themselves into her house to rob her on December 13, 2001. Calabrese testified that the victims were very sure of the persons

they identified. Calabrese again testified concerning the statement made by Sonny that the relators were not involved.

## C. Circuit Court's Determination

After hearing all of the evidence, the circuit court granted Ely's and Miller's petitions. The court explained that the relators met their burden of proving beyond a reasonable doubt that they were in Illinois at the time of the offenses. The court found that the respondent failed to create a contradictory factual issue as to the relators' whereabouts on those days. The court found:

> "that the [respondent], in responding to the evidence provided by both Miller and Ely, failed to prove the existence of a contradictory factual issue. That is not to say the [respondent] did not seek to contradict the evidence presented by [Miller] and [Ely]. The [respondent] did, in fact, pursue such a contradiction.
>
> In making this finding, the Court starts from a premise. That is, *whether or not the [respondent] created a contradictory factual issue depends on the quality of the facts presented*. It cannot be that the [respondent] by mere presentation of evidence that differs from the evidence presented by the relators creates a contradictory factual issue or issues. If that were true, the hearings conducted by this Court over the last year would be reduced to nothing more than a waiting game, waiting for the [respondent] to present evidence, any evidence, differing from the evidence presented by the relators.
>
> The only evidence tying Ely and Miller to the state of Michigan and those offenses is the testimony of John Calabrese, a lieutenant from the [Eastpointe], Michigan, Police Department. \*\*\* I do not believe any misrepresentations were made to the Court by Lieutenant Calabrese.
>
> I do find, however, that the method by which the relators were identified in Michigan calls into issue the credibility of—the reliability of the eye witness identifications. Calabrese, after receiving a tip from an as-of-yet unidentified source, came to the conclusion that Chicago gypsies were responsible for the string of burglaries.
>
> Acting on that honestly held belief, Lieutenant Calabrese showed the elderly burglary victims—two of whom were close to ninety years old—a group of photographs containing only Chicago gypsies.
>
> It should also be noted that the initial descriptions of the suspects found in the police reports did not match the relators in this case. Among other substantial discrepancies, the reports described the suspects in the string of burglaries as alternatively white males and Italian males. Again, these witness identifications are the only evidence placing Ely and Miller in the state of Michigan on the dates in question.
>
> *Given the strength of the evidence presented by the relators and*

*the relative weakness of the evidence presented by the [respondent]*, I find the following:

First, [Ely] proved conclusively or beyond a reasonable doubt that he was in the State of Illinois on December 11th and December 12th of the year 2001; and additionally, I find that [Miller] proved conclusively or beyond a reasonable doubt that he was in the State of Illinois on December 11th and December 13th, 2001." (Emphasis added.)

This appeal followed.

## II. Analysis

### A. Appellee Miller

■ Initially, we note that Miller did not submit an appellee's brief with the court. Although a reviewing court is not compelled to serve as an advocate for an appellee, it may sustain the judgment of the trial court based on its review of the record as justice may require. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493 (1976). "In other cases if the appellant's brief demonstrates *prima facie* reversible error and the contentions of the brief find support in the record the judgment of the trial court may be reversed." *Talandis Construction Corp.*, 63 Ill. 2d at 133. Where "the record is simple and the claimed errors are such that the court can easily decide them without the aid of an appellee's brief," a reviewing court will decide the merits of the appeal. *Talandis Construction Corp.*, 63 Ill. 2d at 133. In this case, because the record is simple and because we have the benefit of Ely's brief, we will decide the merits of the respondent's appeal as it affects Miller as well.

### B. Standard of Review

Pursuant to Supreme Court Rule 341(h)(3), an appellant's brief "must include a concise statement of the applicable standard of review for each issue, with citation to authority." 210 Ill. 2d R. 341(h)(3). Therefore, a reviewing court has an obligation to inform the parties of the standard of review that it employed in deciding the issues on appeal.

The parties disagree as to the proper standard of review. Relying on language in *People v. Johnson*, 206 Ill. 2d 348, 358, 794 N.E.2d 294 (2002), the respondent contends that the issue is a matter of law and our standard of review is *de novo*. Ely disagrees that *Johnson* supports such a standard of review here but does not set out an alternative standard. Ely suggests that some deference is owed to the trial court because its decision to discharge the relators was based on fact-findings and credibility determinations.

■ It appears the standard of review was established by our supreme court in *People ex rel. James v. Lynch*, 16 Ill. 2d 380, 385, 158 N.E.2d 60 (1959), cited by neither party. In affirming the quashing of a writ of *habeas corpus* and remanding the relator to the demanding state, our supreme court stated: "This conclusion cannot be disturbed unless it is contrary to the manifest weight of the evidence." *Lynch*, 16 Ill. 2d at 385. Based on *Lynch*, we employ the standard of manifest weight of the evidence in our review of this appeal.[2]

## C. Issue Presented by the Parties

The central dispute as set out by the parties is whether "contradictory factual issues" were raised by the evidence presented at the *habeas corpus* proceeding. The respondent contends that the trial court erred in finding the absence of contradictory factual issues because its finding was the result of an improper weighing of the evidence concerning the circumstances of the victims' identification of the relators. The trial court therefore erred when it granted the writs and discharged the relators.

Ely contends that he presented "credible evidence that he was not in the [State of Michigan] at the time indicated in the rendition papers." It was then incumbent upon the respondent to present "evidence contradicting and impeaching of that evidence sufficient to create a credible factual issue." Ely contends that as to the evidence the respondent elicited from Lieutenant Calabrese, that evidence was hearsay and, therefore, not competent. As such, it was insufficient to create a "credible factual issue to warrant extradition." Accordingly, the trial court properly determined that the relators were not in the State of Michigan on the dates of the offenses and, hence, not fugitives from justice.

---

[2]In the context of a *habeas corpus* proceeding where the historical facts are "readily verifiable" (*Michigan v. Doran*, 439 U.S. 282, 289, 58 L. Ed. 2d 521, 527, 99 S. Ct. 530, 535 (1978)), and courts "may not weigh the evidence" regarding the presence or absence of the relator in the demanding state when the crimes occurred (*People ex rel. Webb v. Babb*, 5 Ill. 2d 35, 41, 123 N.E.2d 822 (1954)), there is a real question whether any deference is due on the ultimate question of whether to grant or quash a writ of *habeas corpus* so that a *de novo* standard of review ought to apply. See generally *Johnson*, 206 Ill. 2d at 360 (standard of review depends in part on "the degree to which the [trial] court must assess credibility, weigh facts, and draw inferences"); *People v. Jones*, 215 Ill. 2d 261, 268, 830 N.E.2d 541 (2005) (manifest weight of evidence applies to facts found by the trial court, but the ultimate question of relief is reviewed *de novo*).

No question is presented regarding the adequacy of the extradition warrants or supporting documents.[3]

## D. Federal Law Governing Extraditions

Pursuant to section 10 of the Extradition Act (725 ILCS 225/10 (West 2002)), the relators filed petitions for writs of *habeas corpus*, each alleging that he was not a fugitive from justice.

"A proceeding by *habeas corpus* under the Fugitives From Justice act [(Ill. Rev. Stat. 1937, ch. 60, par. 1, *et seq.*)][4], is a civil suit instituted by the petitioner for the protection of his own civil rights and not one by the Government to punish him for a crime. [Citations.] The return of a fugitive from one State to another is a Federal and not a State matter. It is governed by the constitution of the United States and the act of Congress passed pursuant thereto, and in these proceedings this court is bound by the decisions of the Supreme Court of the United States. [Citations.]" *People ex rel. Guidotti v. Bell*, 372 Ill. 572, 575, 25 N.E.2d 45 (1939).

As the United States Supreme Court noted:

"The Extradition Clause was intended to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed. [Citations.] The purpose of the Clause was to preclude any state from becoming a sanctuary for fugitives from justice of another state and thus 'balkanize' the administration of criminal justice among the several states." *Michigan v. Doran*, 439 U.S. 282, 287, 58 L. Ed. 2d 521, 526, 99 S. Ct. 530, 534 (1978).

The concepts of comity and full faith and credit play an integral role in the extradition process. *Doran*, 439 U.S. at 287-88, 58 L. Ed. 2d at 526-27, 99 S. Ct. at 534-35.

■■ Hence, extradition proceedings in the asylum state are meant to be summary and ministerial proceedings; they are not judicial inquiries into the merits of the charges. *Doran*, 439 U.S. at 288, 58 L. Ed. 2d at 527, 99 S. Ct. at 535. While the Governor's determination of whether a person is a fugitive from justice is a question of fact (*Munsey v. Clough*, 196 U.S. 364, 372, 49 L. Ed. 515, 517, 25 S. Ct. 282, 284 (1905)),

"[o]nce the governor has granted extradition, a court considering release on habeas corpus can do no more than decide (a) whether

---

[3]As earlier noted, the extradition warrant regarding Ely is not in the record. But as no issue is raised regarding the sufficiency of the extradition documents, we presume an arrest warrant signed by a judge in Macomb County, Michigan, exists for Ely as one in the record is present for Miller.

[4]This Act is now the Extradition Act pursuant to which the relators filed their *habeas corpus* petitions. 725 ILCS 225/1 *et seq.* (West 2002).

the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive. These are historic facts readily verifiable." *Doran*, 439 U.S. at 289, 58 L. Ed. 2d at 527, 99 S. Ct. at 535.

In this case, the only historical fact at issue is whether the relators are fugitives from the State of Michigan.

" 'One is a fugitive from justice, within the meaning of the extradition laws, where it is shown that he was in the demanding State on the date fixed in the charge against him and that he thereafter left the State, and he is a fugitive from the time of such leaving regardless of his purpose or motive in leaving.' " *Cohen v. Sheahan*, 298 Ill. App. 3d 961, 967, 700 N.E.2d 1122 (1998), quoting *People ex rel. Shockley v. Hardiman*, 152 Ill. App. 3d 38, 45, 504 N.E.2d 109 (1987). "It is well settled that the Governor's warrant constitutes a *prima facie* case that an accused is a fugitive from justice, and that after its introduction into evidence the burden of proof is then on the accused to show that he was not in the demanding State at the time of the offense charged. [Citations.]" *People ex rel. O'Mara v. Ogilvie*, 35 Ill. 2d 287, 288, 220 N.E.2d 172 (1966).

The burden a relator must meet to warrant a discharge is an extremely heavy one. "When it is conceded, or *when it is so conclusively proved, that no question can be made* that the person was not within the demanding State when the crime is said to have been committed, and his arrest is sought on the ground only of a constructive presence at that time, in the demanding State, then the court will discharge the defendant." (Emphasis added.) *Munsey*, 196 U.S. at 374, 49 L. Ed. at 518, 25 S. Ct. at 285.

Twenty-four years later, this bright-line rule was further clarified by the United States Supreme Court in *Doran*, where the majority and the concurring opinions agreed: "[W]hen a neutral judicial officer of the demanding state has determined that probable cause exists, the courts of the asylum state are without power to review the determination." *Doran*, 439 U.S. at 290, 58 L. Ed. 2d at 528, 99 S. Ct. at 536 (opinion of Burger, C.J., joined by Stewart, White, Powell, Rehnquist, and Stevens, JJ.). "It is enough if the papers submitted by the demanding State in support of its request for extradition *facially* show that a neutral magistrate has made a finding of probable cause. If they do, it is not the province of the courts of the asylum State *** to probe the factual sufficiency of that finding." (Emphasis in original.) *Doran*, 439 U.S. at 297, 58 L. Ed. 2d at 532-33, 99 S. Ct. at 539 (Blackmun, J., concurring, joined by Brennan and Marshall, JJ.).

Here, there is no issue regarding the adequacy of the Governor's warrants and supporting documents, which included arrest warrants signed by a Michigan judge upon a showing of probable cause. The relators' only contention against the rendition warrants amounts to an alibi defense. This is precisely the sort of contention that the United States Supreme Court foreclosed in *Doran*. This prohibition of a reexamination of "the factual basis for the finding of probable cause which accompanies the requisition from the demanding state" (*Doran*, 439 U.S. at 286, 58 L. Ed. 2d at 525, 99 S. Ct. at 534) was recognized by our supreme court six years prior to *Doran* in *People ex rel. Kubala v. Woods*, 52 Ill. 2d 48, 54, 284 N.E.2d 286 (1972), where the court held, "even though the complaints, standing alone, do not show probable cause, they are affidavits made before a magistrate *** and are sufficient to support the rendition warrant." Accordingly, the *Kubala* court affirmed the quashing of the writ of *habeas corpus* and the remanding of the relator to the custody of the sheriff of Cook County.[5]

■ Because the extradition warrants in this case include arrest warrants signed by a Michigan judge upon findings of probable cause, the trial court's finding that the relators where not present in the State of Michigan on the dates of the offenses charged is against the manifest weight of the evidence. Inquiry into the factual basis for the arrest warrants for the relators was foreclosed to the trial court. It was sufficient that the arrest warrants were issued by a judge upon a finding of probable cause to support the rendition warrants. *Kubala*, 52 Ill. 2d at 54. Thus, the trial court erred in discharging the relators.

## E. Illinois Case Law

Even if we decide this appeal upon the issue presented by the parties—whether contradictory factual issues were raised by the evidence in the habeas proceeding—the same result obtains. As earlier noted, the burden of showing that a relator was not in the demanding state at the time of the offense charged in the extradition warrant is an extremely heavy one. " '[O]nly when it is so conclusively proved that no question can be made* that the person was not within the demanding State when the crime is said to have been committed can he be discharged.' " (Emphasis added.) *People ex rel. Blassick v. Callahan*,

---

[5]The holdings of *Doran* and *Kubala* cast substantial doubt on the continuing authority of the two cases primarily relied upon by Ely: *Nelson v. People*, 11 Ill. App. 3d 1092, 297 N.E.2d 172 (1973), and *People v. Ryan*, 129 Ill. App. 3d 932, 473 N.E.2d 561 (1985), where the courts questioned any "conclusive presumption" regarding the extradition warrants. However, because the narrow issue present in *Nelson* and *Ryan* is not present here, we restrict our treatment of each case below to distinguishing each.

50 Ill. 2d 330, 336, 279 N.E.2d 1 (1972), quoting *People ex rel. Webb v. Babb*, 5 Ill. 2d 35, 41, 123 N.E.2d 822 (1954). "[T]o entitle one to release on *habeas corpus*, it must appear from the evidence, *beyond all reasonable doubt*, that the relator was without the demanding State when the offense was committed. [Citations.]" (Emphasis added.) *Ogilvie*, 35 Ill. 2d at 289. Judicial interference with the Governor's warrant is to be avoided, "unless that order be so palpably and conclusively shown to be wrong as to warrant an *inference of fraud or inadvertence.*" (Emphasis added.) *Bell*, 372 Ill. at 577.

In a *habeas corpus* proceeding, the question of fact of whether the relator is a fugitive from justice turns solely on the presence or absence of contradictory factual issues regarding his whereabouts when the charged offense was committed. If contradictory factual issues have been raised, then the relator has failed to meet his burden to overcome the respondent's *prima facie* case. "[The *habeas* petitioner] insist[s] that because no witness appeared to directly controvert the alibi evidence offered that evidence must be taken as true and the petitioner discharged. This is not the law and it cannot be without entirely upsetting the constitutional provision." *Bell*, 372 Ill. at 577. If contradictory factual issues are not raised, then this may be tantamount to a concession by the respondent that the relator was not present in the demanding state when the crime was committed and that the rendition warrant is based solely on "constructive presence." *Munsey*, 196 U.S. at 374, 49 L. Ed. at 518, 25 S. Ct. at 285. As to either determination, "the court may not weigh the evidence." *Babb*, 5 Ill. 2d at 41.

Ely contends that the trial court correctly granted the writs of *habeas corpus* and discharged the relators primarily on the authority of *Nelson v. People*, 11 Ill. App. 3d 1092, 297 N.E.2d 172 (1973). The trial court found *Nelson* to be controlling as well: "At the very least, the [respondent] must create a contradictory factual issue as to the whereabouts of Ely and Miller on the dates in question, and the case that sets that forth is [*Nelson v. People*, 11 Ill. App. 3d 1092, 297 N.E.2d 172 (1973)]." Ely cites additionally *People v. Ryan*, 129 Ill. App. 3d 932, 473 N.E.2d 561 (1985). Both are Third District Appellate Court cases. Neither case provides any direct support for the discharging of the relators here.

In *Nelson*, the court explicitly confined its holding to where "[n]one of the witnesses, including the relator, was cross-examined by the respondent and no rebuttal evidence was presented by the respondent." *Nelson*, 11 Ill. App. 3d at 1094. To the respondent's contention that its *prima facie* case sufficed, the court replied: "We do not believe this position is tenable, since if true, the effect would be to give the warrant a conclusive presumption since in all cases the

evidence would be merely contradictory." *Nelson*, 11 Ill. App. 3d at 1094. This reasoning was followed in *Ryan*, where the court held: "When the State introduces no evidence other than the extradition warrant and does not dispute the credibility of the petitioner's evidence that he was not in the demanding State at the time of the commission of the alleged crime, the extradition warrant itself is not sufficient to create contradictory factual issues." *Ryan*, 129 Ill. App. 3d at 935, citing *Nelson*, 11 Ill. App. 3d at 1094.

Here, as Ely concedes, in addition to challenging the credibility of the witnesses put forth by the relator, the respondent elicited testimony from Lieutenant Calabrese concerning the identifications of each relator by the victims of the crimes charged. In failing to be persuaded that this testimony raised contradictory factual issues, the trial court called into question the reliability of the victims' identifications of the relators and commented on the strength of the evidence presented by the relators and the "relative weakness" of the evidence presented by the respondent. Regarding whether the evidence raised contradictory factual issues, the court stated, "[that] depends on the quality of the facts presented" by the respondent. As the court determined "that the method by which the relators were identified in Michigan calls into issue *** the reliability of the eyewitness identifications," it found that each relator "proved conclusively or beyond a reasonable doubt that he was in the State of Illinois" on the dates the offenses occurred in Michigan, based on "the strength of the evidence presented by the relators and the relative weakness of the evidence presented by the [respondent]."

In further support of the trial court's conclusion, Ely contends that Lieutenant Calabrese's testimony was hearsay and therefore insufficient to raise contradictory factual issues in light of the credible testimony of his witnesses.

We first note that not only did the relators fail to object to Lieutenant Calabrese's testimony, but they were first to elicit testimony from Calabrese concerning the victims' identification of Ely and Miller. Where hearsay evidence is admitted without objection, it is to be considered and given its natural, probative effect. *People v. Robinson*, 197 Ill. App. 3d 1012, 1016, 557 N.E.2d 267 (1990). Because Ely did not object to Calabrese's testimony, his argument that the evidence, as hearsay, is not admissible on the issue presented here is rejected. "Failure to raise an objection to that evidence precludes relator from questioning its admissibility on *** appeal." *People ex rel. Molock v. Elrod*, 53 Ill. App. 3d 14, 15, 368 N.E.2d 487 (1977). Moreover, the hearsay nature of Calabrese's testimony is not a basis to exclude it. See *People ex rel. Emerson v. Pratt*, 23 Ill. App. 3d 340, 344, 319 N.E.2d

108 (1974) (extradition hearings are not governed by rules of evidence for trials and more latitude is allowed). Under these circumstances, Ely's contention that this evidence should not be considered in determining whether contradictory factual issues were raised in the *habeas* proceedings is without merit.

Based on the evidence in the record, we find the opposite conclusion to that of the trial court to be clearly evident. This is not a case where the respondent does nothing more than make a "mere presentation of evidence that differs from the evidence presented by the relators." The respondent's case, except for calling into question the credibility of the relators' witnesses who seemingly place the relators in Illinois on the dates in question, rested on evidence concerning the crimes the relators were charged with committing in Michigan. In particular, identification evidence regarding the residential break-ins. This evidence goes directly to the crimes the relators were charged with committing in Michigan and differs substantially from the evidence presented by the relators. The State's evidence, beyond its *prima facie* case, clearly raised contradictory factual issues whether the relators were in fact in Michigan on the dates in question. The trial court holding otherwise is clearly against the manifest weight of the evidence, thus precluding the discharge of each relator. *Bell*, 372 Ill. at 578. The resolution of the factual issues presented in each relator's claim of alibi is properly left to be resolved in judicial proceedings in the State of Michigan.

## III. Conclusion

Because the extradition warrants are supported by arrest warrants signed by a Michigan judge based on probable cause that the relators committed offenses in Michigan, the granting of the writs of *habeas corpus* and discharging each relator was against the manifest weight of the evidence. Also, based on our review of the evidence presented at the *habeas* proceeding, the relators did not meet their burden of conclusively showing that they were not in Michigan at the time of the alleged offenses. Under either analysis, we reverse the judgment of the circuit court and reinstate the Governor's warrants for Ely and Miller.

Reversed and remanded.

WOLFSON and HALL, JJ., concur.